IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 1:07-cr-030 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | SENTENCING BRIEF |
| CHRISTOPHER S. HANDLEY, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the United States of America, through United States Attorney Nicholas A. Klinefeldt and Assistant United States Attorney Craig Peyton Gaumer, and submits its SENTENCING BRIEF.

CONTENTS


I Introduction . . . . . . . . . . 2

II. Statement of Facts . . . . . . . . . . 4

III. Sentencing Guidelines . . . . . . . . . . 10

IV. Section 3553(a) Factors . . . . . . . . . . 10

A. The nature and circumstances of the offense . . . . . . . . . . 11

B. History and characteristics of the defendant . . . . . . . . . . 14

C. The kinds of sentences available under relevant statutes and the advisory sentencing guidelines . . . . . . . . . . 15

D. The need for the sentence imposed to reflect the seriousness of the offense to promote respect for the law, and to provide just punishment for the offense . 16

E. The need for the sentence imposed to afford adequate deterrence to criminal conduct . . . . . . . . . . 16

F. The need for the sentence imposed to protect the public from further crimes of the defendant . . . . . . . . . . 17

G. The need for the sentence imposes to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . . . . . . . . 17

H. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . . . . . . . 18

V. Conclusion . . . . . . . . . . 19

## I. Introduction.

This is an unusual case, involving an unusual man.[1]

Defendant Christopher Handley faces sentencing for knowingly possessing obscene visual representations of the sexual abuse of children, under 18 U.S.C. § 1466A(b), and for causing the mailing of obscene matter, in violation of 18 U.S.C. § 1461. In layman's terms, he ordered, received, and collected dozens of obscene graphic novels and anthologies that depicted small children as sex objects to be used and abused at the whims of adults, children, and even animals. A three-ring binder containing samples of the stories and images at issue, translated into English, has been provided to the Court.

Even though Mr. Handley had no child pornography, that is the type of case to which his is most analogous. And, like a significant number of defendants caught with lewd images of real children, Mr. Handley has no criminal history. He has, however, spent the past 17 years collecting over a thousand works of manga from Japan of a sexual nature, using images of young girls in such books as a substitute for sex. (PSR ¶¶ 19, 21 - 22). He reads as many as 35 manga books a week, and has thousands of DVDs of Japanese anime. (PSR ¶ 54). His primary means of social interaction with others has not been involvement in the community, but has been playing online role-playing games. (PSR ¶ 54). Mr. Handley recognizes that these hobbies have been a compulsion, causing

[1]This is not a landmark case. The dissemination of the obscene materials in this case could have been prosecuted under the general federal obscenity statute, 18 U.S.C. § 1461, which has been part of the United States Code for decades. Section 1466A, the most recent federal obscenity statute, prohibits a narrower category of "hardcore" pornography involving real or apparent minors, where such depictions lack literary, artistic, political, or scientific value. H.R. Conf. Rep. 108-66, 2003 U.S.C.C.A.N. 683, 697.

him to incur "significant debt from buying various Japanese art forms" and "upgrading his computer system." (PSR ¶ 55). He lives in the basement of his mother's home. (PSR ¶ 56).

When Mr. Handley underwent a consensual psychosexual evaluation, he declined to answer numerous standard questions in the multiphasic sex inventory, which prevented Dr. Smith from gaining a complete picture as to the nature and extent of his sexual deviancy. (PSR ¶¶ 64 - 65). Rather than confronting his problems so he can address them directly, Mr. Handley has produced "a guarded, defensive, and evasive profile." (PSR ¶ 65). Contradicting his statements to the investigating agent, Mr. Handley denied to Dr. Smith that he had any sexual interest in children. (PSR ¶ 65). Contrary to the statement of facts in support of his plea agreement and his representations to the postal inspector, Mr. Handley questioned to Dr. Smith whether any of the drawings in his collection depicted children. (PSR ¶ 65). Mr. Handley paints a confusing portrait of himself.

Under the unique facts of this case, the government does not believe a significant amount of jail time is merited, under the factors set forth in 18 U.S.C. § 3553(a), specifically given the history of the defendant and the nature of the offense. However, some aspects of the defendant's history and characteristics establish he is in strong need of deterrence and supervision to monitor and address his sexual interests in children, in whatever form they genuinely exist. Accordingly, for the reasons set forth below, the United States recommends a non-guidelines sentence of 6 months' imprisonment for count two, violating 18 U.S.C. § 1466A(b), a class C felony, followed by 3 years of supervised release; and 5 years of probation on count five, violating 18 U.S.C. § 1461,

a class D felony, to begin at the same time as, and run partially concurrent with, the 3-year supervised release term, as provided in 18 U.S.C. § 3564(b).

## II. Statement of Facts.

On May 12, 2006, Des Moines, Iowa, United States Postal Inspector Troy Raper was contacted by a Chicago, Illinois, Postal Inspector, who informed him that special agents from Immigration and Customs Enforcement ("ICE") had intercepted a mail package coming into the United States from Japan addressed to "Chris Handley," in Glenwood, IA, with a return address of "cosplay café/Tomo Kawa.i." The package contained seven books depicting the obscene sexual abuse of children. The books are generally described as:

**Book 1)** "unfinished school girl" (presented by TAMACHI YUKI) (LE Comics);

**Book 2)** "I ♡ DOLL" (MAKAFUSIGI presents) (Seraphim Comics);

**Book 3)** "for ESSENTIAL 3" (THE ANIMAL SEX ANTHOLOGY Vol.3) (Izumi Comics);

**Book 4)** "NEKOGEN, Neighboring House Family" (MD Comics);

**Book 5)** ISBN4-89465-172-6 (No English language title found) (Seraphim Comics);

**Book 6)** ISBN4-89465-222-6 (No English language title found) (Seraphim Comics); and

**Book 7)** ISBN4-89465-193-9 (No English language title found) (Seraphim Comics).

Each of these books contained numerous cartoon drawings of minors engaging in sexually explicit conduct. On May 12, 2006, Inspector Raper received from the Chicago office a package containing the seven books and the Express Mail packaging they had originally been inside.

A few examples of the numerous visual depictions/cartoons contained in each of the books include:

**Book 1**

**A.** (S/M)[2] (M)[3] (L/E)[4] - a minor female (#1) is tied up with her arms behind her back by another female (#2). Female #2 proceeds to masturbate and digitally penetrate the genital area of the minor female #1. The genital area of minor female #1 is frequently shown.

**B.** (S/M) (M) (L/E) - a minor female is shown masturbating as a minor male observes. The minor female then performs oral sex on the minor male. The minor female and the minor male then have genital- to-genital intercourse.

**Book 2**

**A.** (S/M) (L/E) - a minor female is shown being given money by a male subject. The minor female is then observed engaging in oral and genital sex with male subjects.

**Book 3**

**A.** (S/M) (B)[5] (L/E) - The story depicts a minor female being raped by a pig by genital-to-genital intercourse. The scene continues as the pig is depicted ejaculating inside the genitals of the minor female. One of the final scenes shows the nude minor female sitting up with her legs open, with pig semen coming out of her genitals as two pigs watch.

**Book 4**

**A.** (S/M) (M) (L/E) - Scenes show a male subject smacking a minor female. The next scenes shows the male subject pointing to his erect penis. The scenes continue with the minor female performing oral sex on the male, masturbating her exposed genitals, and engaging in genital-to-genital sex with the male subject.

---

[2]SM = sadistic or masochistic.

[3]M = masturbation.

[4]L/E = lascivious exhibition of the genitals of pubic area of an person.

[5]B = bestiality.

**Book 5**

**A.** (S/M) (M) (L/E) - The images show a minor female performing oral sex on a male penis. The scenes show the minor female's nude genitals as she masturbates. The scene continues as the minor female and the male subject engage in genital-to-genital sex.

**Book 6**

**A.** (S/M) (B) (L/E) - A minor female is shown being penetrated from behind by a male's penis while the minor female is performing oral sex on a dog. The scene goes on to show the minor female's genitals being penetrated by a dog. The following scenes show the minor female's exposed genitals ejecting dog semen.

**Book 7**

**A.** (S/M) (L/E) - The pictures show a minor female depicted as sleeping when a young male approaches her bed. While she sleeps, the male uses her mouth and hand to masturbate himself until she wakes up. The pictures continue to show the two engaging in genital-to-genital sex.

**B.** (S/M) (L/E) - The picture shows a minor female masturbating male #1's penis while performing oral sex on male #2. Male # 2 is shown holding what appears to be a camcorder.

A federal search warrant was obtained for Mr. Handley's home, and it was executed on May 23, 2006, after he accepted a controlled delivery of the intercepted items he had ordered and agreed to return home with law enforcement officers. Items recovered during the search included 1,200 Japanese manga books, publications, or documents for which the agents determined there was probable cause that the materials contained obscene depictions of the sexual exploitation of minors. Some of these items were returned after it was determined that they did not constitute or contain contraband, though over 80 books, which is not an insignificant amount, were retained.

None of the books seized were written in English, though some contained a few English words. The books were written in Japanese. Many of the books were anthologies, which contained

numerous illustrated stories on similar topics. For example, Mr. Handley's collection contained numerous anthologies from the series, "Comic LO,"[6] and works where the predominate theme of the stories was bestiality, including sex between human minors and adult animals. Other common themes in the works Mr. Handley collected include taboo relationships, such as between a teacher and young student, a young brother and young sister, and sexual relations between children. The case does not involve just a few panels of images or crude drawings; the sexual abuse of children is vividly depicted as the core theme of perhaps hundreds of stories in dozens of works explicit drawings. The minors depicted being sexually abused range from toddlers to school girls to preteens; androgynous images are rarely used in the stories.[7] The sexual abuse is not a small part of a larger plot in these stories; the depiction of small children as sex objects, and their sexual abuse, are the primary subjects of these stories. A sample of the works have been translated into English, and establish, along with Mr. Handley's admission at the change of plea hearing, that story lines in

[6]Comic LO is a Japanese magazine featuring "lolicon" or prepubescent, early pubescent and highly juvenile-looking girls. The "LO" stands for "lolita only".

[7]If a drawing did not clearly depict a minor, and could arguably be of a person 18 or older, the government gave the defendant the benefit of any doubt. Some of the more graphic images, which Mr. Handley possessed in print and electronic form, depict a toddler being sexually assaulted by multiple adult males, simultaneously having vaginal intercourse, performing oral sex, and masturbating three different men, while another waits his turn; another shows a toddler being raped while bound and gagged in a dentist's chair; another shows the graphic display of an infant girl's genitals, then an adult performing oral sex on her and having her take his penis into her mouth as she would a bottle of milk or formula. The government also did not count as within the scope of the charges under 18 U.S.C. § 1466A a multitude of images in Mr. Handley's collection that depicted the sexual abuse of quasi-human minors, with characteristics and features of real and mythological beings.

which he was interested are, indeed, about the sexual abuse of children. Mr. Handley had over 80 books of this type, not just the handful that were intercepted in the mail.

A forensic analysis of two computers recovered from Mr. Handley's home on March 23, 2006, also revealed numerous downloaded drawings of minors engaged in sexually explicit activity, as well as numerous emails from between November 9, 2005, and May 20, 2006, which establish that Mr. Handley used the internet to order books with such images.

Mr. Handley was interviewed by Inspector Raper on March 23, 2006. Mr. Handley admitted he ordered the 7 books from "cosplay café" a week or so earlier, and confessed to ordering similar materials earlier from "Jlist" in Japan and "Mandrake.com." He had previously received about 12 similar packages. The books were advertised as "Lolita" materials, which he knew meant "young girl" or "appearance of young." Mr. Handley stated such books were, for him, essentially a substitute for "basically sex." He acknowledged that his current sexual fantasies focused on having sex with females between the ages of 14 and 15.

On May 23, 2006, Mr. Handley provided a voluntary written statement to Inspector Raper, which states the following:

> I started viewing Japanese Anime (or Animation) in approximately the year '92 - 95 while in college. For example: Record of the Lodoss War which is a Dungeons & Dragons style adventure. As the internet became popular I was able to explore it and find materials of an adult and sexual nature that were linked to the anime and later Japanese comic books or "manga." After time and for the past couple years my interest in the Japanese "cartoons" I evolved a fascination for images of young girls engaged in sexual activity. Within the past 2-3 years this interest has centered upon young girls within the ages of 14-15 years and I used masturbation as an outlet for these phantasies, using these images. Todays package of seven books for $25 apiece were ordered online under the appellation of Lolita or "young girl" and also contained "Kemono" or animals. I've purchased approximately a half dozen

> packages containing this materials or "Lolitas" within the past year. I didn't realize that this material fell under the banned paraphernalia within the US. If I had know that material of this nature was against the law, I would never have ordered it and would have destroyed any of it that I currently am in possession of.

In early 2009, Mr. Handley submitted to a psychological evaluation at the direction of his pretrial services officer. The utility of the evaluation is limited because several of the assessments indicated that Mr. Handley, "although honest with what he reported, was not disclosing enough to gain a complete picture of the nature and extent of [his] sexual deviancy." The sexual deviance portion of the assessment was not particularly helpful because Mr. Handley did not answer enough questions to allow interpretation. "The main finding from the testing results is that Mr. Handley produced a guarded, defensive and evasive profile. His test taking behavior suggests there is likely more to know about him than he is willing to disclose at this time." In other words, Mr. Handley purposefully underperformed on the assessment to prevent Dr. Smith from obtaining accurate data about his sexual deviancy, which is a critical factor in this sentencing.

Rather than confirming his statements to Inspector Raper that he was fantasizing about 14-15 year old girls, Mr. Handley changed his story, and told Dr. Smith that he was primarily fantasizing about being the female having sex with a male. This underscores that fact that the root of Mr. Handley problems appears to be complex and confusing gender and sexuality issues.

Dr. Smith concluded that the offenses for which Mr. Handley was charged simply do not lend themselves with "being assessed with traditional sexual deviancy risk assessment tools," and his risk of "committing a sexual offense cannot be determined," one way or any other. Though this evaluation was intended by the government, defense counsel, and probation to assist them in

obtaining an accurate assessment of Mr. Handley's psychological and social-sexual make-up, his intentional under-performance has prevented counsel and the Court from having needed information about the defendant. This underscores his need for long-term mental health treatment.

## III. Sentencing Guidelines

Appendix A of the U.S. Sentencing Commission Guidelines Manual instructs that the applicable guideline section for violation of 18 U.S.C. § 1466A is USSG §2G2.2.

The base offense level under USSG §2G2.2(a)(1) is 18.

Depictions portrayed sadistic or masochistic conduct, or other depictions of violence, and thus a 4 level increase under USSG §2G2.2(b)(4) applies.

A 2 level increase applies under USSG §2G2.2(b)(7) because a computer was used.

A 3 level reduction under USSG §3E1.1 applies, unless the defendant does not clearly accept responsibility for his conduct.

***The adjusted offense level under § 1466A(b)(1) is estimated at 21 (37 - 46 months).***[8]

## IV. Section 3553(a) Factors

Section 3553(a) instructs that the "court shall impose a sentence sufficient, but not greater than necessary," and shall consider specific categories of information in making this determination. The pertinent categories are discussed below.

---

[8]For a violation of 18 U.S.C. § 1461, the applicable guideline section is USSG §2G3.1. ***The adjusted offense level under USSG. § 2G3.1 is estimated at 13 (12 - 18 months),*** after acceptance of responsibility, which is derived from a base offense level of 10 (USSG §2G3.1(a)), and enhancements for using a computer (2 levels under USSG §2G3.1(b)(3)) and having materials that portray sadistic, masochistic, or violent conduct. (4 levels under USSG §2G3.1(b)(4), and credit given for accepting responsibility.

**A. The nature and circumstances of the offense.** While the offenses at issue may, perhaps, be considered somewhat less serious than those involving photographs of real children, they are, nevertheless, serious crimes that depict socially intolerable acts against minors.

In *Abrams v. United States,* 250 U.S. 616, 630 (1919), Justice Holmes introduced our legal system to the notion that the best method for testing any sort of speech is "to get itself accepted in the competition of the market." Our nation's evolving constitutional standards for free speech ensure protection of a wide array of materials that many may disfavor, as reflected by the "stringency of our obscenity test, designed to avoid any risk of suppressing socially valuable expression. Communities cannot close down 'porn-shops' by banning pornography (which, so long as it does not cross the distant line of obscenity, is protected)." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 252 (1990) (Scalia, concurring and dissenting, in part). And the primary statute at issue, 18 U.S.C. § 1466A, which criminalizes not just obscene images, but a narrowly-defined category of drawings, cartoon, sculpture, painting, or other visual depiction of "a minor engaging in sexually explicit conduct,"[9] is an appropriate regulation of the market place because it regulates materials that are "the most patently offensive in [their] prurience - i.e., that which involves the most lascivious

[9] The term "sexually explicit conduct" is derived from 18 U.S.C. § 1466A(f)(2) and 18 U.S.C. § 2256(2)(A) or (2)(B) and means: sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; lascivious exhibition of the genitals or pubic area of any person; or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; or graphic or lascivious simulated bestiality, masturbation, or sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person.

displays of sexual activity." *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 388 (1992). In other words,

§ 1466A establishes a type of obscenity crime that is narrower in scope than that which has been held constitutionally permissible under other statutes.

The obscene works that Mr. Handley stands convicted of illegally receiving and possessing have been rejected by the marketplace of ideas in the United States, as demonstrated by the fact that he had to import them from Japan.[10]

Some may argue that the crime at issue is not serious because no real children were involved. Such a viewpoint is short-sighted because it gives little weight to the nature of obscenity crimes, in general, and to the specific images involved in this case. A picture, proverbially, paints a thousand words, and there is no doubt that comic books, graphic novels, and works of manga and anime have a powerful ability to communicate through their use of dramatic imagery. Since the 1960s, the genre of comic books has been transformed from a target market of younger customers to a broad, word-wide market aimed at older, more mature consumers. The ground-breaking graphic novel, "Watchmen," by Alan Moore and Dave Gibbons was even named by *Time* magazine of one of its top 100 novels of the 20th century. The power of the illustrated story should not be short-changed.

"A work is classified as obscene not upon proof that it is likely to affect anyone's conduct, but upon proof that it violates community norms regarding the permissible scope of depictions of

---

[10]They are certainly not available in Des Moines, according to an employee of the area's largest comic book shop, and one source reportedly could find nothing like them at America's largest comic book convention in San Diego.

sexual or sex-related activity." *American Amusement Machine Ass'n v. Kendrick,* 244 F.3d 572, 574 (7th Cir. 2001) (Posner).[11]

In rejecting an Eighth Amendment challenge to § 1461, the Eighth Circuit explained the nature of obscenity offenses, noting that such an argument lost "sight of the corrupting nature of the offense and of the necessity for effectually checking the temptation to use the mails for improper purposes." *Rinker v. United States,* 151 F. 755, 760 (8th Cir. 1907). The *Rinker* Court added that the "dissemination of that which makes against decency, purity, and chastity in private life is infinitely more dangerous to society than are many offenses, the authorized and commonly approved punishment for which is more severe." *Id.* Drawings, such as those at issue, can certainly have a corrupting influence and violate community norms. And, there is no doubt that it is against community norms for adults to treat minors as objects for their sexual gratification.

Section 1466A, the primary statute involved in this case, prohibits the dissemination in interstate commerce of a narrow category of "hardcore" pornography involving real or apparent minors, where such depictions lack literary, artistic, political, or scientific value. H.R. Conf. Rep. 108-66, 2003 U.S.C.C.A.N. 683, 697. Mr. Handley's crime is considered by Congress to be a serious felony, subject to the same penalties as child pornography crimes. *Id.*

This circumstances of the offense establish that this is not an act of aberrant behavior.

Mr. Handley is a connoisseur of Japanese manga and anime, having immersed himself in collecting each to the extent that he admitted it bordered on the compulsive, though he does not,

---

[11]Obscene speech, like the materials at issue, can be totally proscribed without violating the First Amendment because of their "negligible contribution . . . to the marketplace of ideas." *Davenport v. Washington Educ. Ass'n,* 551 U.S. 177 at ---, 127 S.Ct. 2372 at 2381 (2007).

apparently, read Japanese. He did not mistakenly come across these materials; he admitted scoured the internet seeking Japanese manga with stories lines involving the sexual abuse and assault of children, and ended up with dozens of such books, containing hundreds, if not thousands, of such images. The works at issue do not even have arguable scientific, literary, artistic, or political value, such as Vladimir Nabokov's famed novel, "Lolita," Shakespeare's "Romeo and Juliet," or even Alan Moore's recent, but controversial, graphic novel, "*Lost Girls.*" By the defendant's own admissions, the works for which he was convicted of receiving and possessing are clearly obscene.

The offense is serious, and the manner in which he committed it establishes a deeply-seeded, deviant sexual attraction toward children.

**B. <u>History and characteristics of the defendant</u>**. Chief Justice Warren's concurring opinion in *Roth v. United States*, 354 U.S. 476 (1957)[12] provides a reminder of the central focus on obscenity cases:

> It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character.

354 U.S. at 495. Thus, the court needs to consider the nature of the material for what it explains about the conduct and character of the defendant.

The materials in this case depict particularly depraved and deviant sexual behavior.

---

[12]Though the *Roth* constitutional standard for assessing obscenity was later replaced by the *Miller* test, Chief Justice Warren's opinion was limited to explaining why cases concerning alleged obscenity must be treated with great care to protect works of literature or science, which remains a sound principle.

Mr. Handley knowingly ordered these books from Japan, which are not readily available in the United States, because they depict the sexual abuse of children, by adults, by groups of adults, by animals, and by groups of animals. The record of this case, and the psychological exam conduct of the defendant (though incomplete because of his lack of cooperation), strongly suggests deep-seated aberrant sexual disorders that need to be addressed for the protection of society and the well-being of the defendant. The true extent of the problems with which the defendant needs assistance cannot be determined unless and until he acknowledges the true nature of his difficulties and genuinely seeks to work with professionals to address them. He has not, yet, done so.

Mr. Handley has some factors in his favor. He has no criminal history. He is an educated man, with associate degrees in electrical engineering and computer programming. He has a supportive mother.[13]

**C. The kinds of sentences available under relevant statutes and the advisory sentencing guidelines**. The Defendant faces a statutory maximum of ten years in prison, and a guidelines sentence of 37 - 46 months, assuming he fully accept responsibility for his actions. Mr. Handley is not eligible for probation under the advisory sentencing guidelines, but is under the applicable statute.

[13]The record does not reflect whether she is aware of, and grasps, the true extent of her son's legal and psychological difficulties.

**D. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>.** A minimal sentence, such as straight probation, would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. Mr. Handley may argue that this case is "just about drawings," but such a characterization is misleading. This case is not "just about drawings" any more than child pornography cases are "just about photographs," or cases involving threatening to kill a public official are "just about words." This case must be assessed on the totality of the circumstances, based on the factors set forth in § 3553(a). And the most critical factor in this case is not that the obscene materials are drawings, but that the obscene materials depict the sexual assault of minors and adolescents by other children, adults, and animals. These materials have no countervailing scientific, literary, artistic, or political value. The acts depicted in some of these obscene materials are punishable in many jurisdictions by decades or more of imprisonment. The sentence should reflect these facts.

**E. <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct</u>.** The sentence imposed needs to be significant enough to deter others tempted to seek obscene materials depicting the sexual exploitation of children from doing so. It must also deter Mr. Handley from continuing his obsessive acts of collecting obscene materials involving adults, children, and even bestiality. Further, the sentence should deter Mr. Handley from letting his behavior escalate from collecting drawings of children being sexually abused to collecting photographs of real children being sexually abused, or more.

**F. The need for the sentence imposed to protect the public from further crimes of the defendant.** In fairness to Mr. Handley, the record of this case establishes that he is a low risk of committing any other crimes, other than those related to his sexual interest in children. On the other hand, as noted by Dr. Smith, the case against the defendant is so unique that no social science research on recidivism is directly on point. Further, Mr, Handley has made it difficult to give him credit for not being at risk of reoffending by intentionally hiding significant information about his sexual deviancies during his assessment by Dr. Smith. The fact that he is hiding information makes it difficult to conclude that he is low risk for recidivism, because the true nature of his deviance is, due to his own conduct, still unknown at the time of sentencing.

**G. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.** The most pressing sentencing factor in this case is the need for the sentence to provide the defendant with needed mental health care and other correctional treatment. It is obvious from the record that the defendant has some mixture of sexual, and perhaps gender identity, disorders that significantly contributed to his criminal conduct. He apparently has recurring sexual fantasies, sexual urges, and sexual behaviors involving children, and in some cases, non-human objects or entities. *See* Diagnostic And Statistical Manual Of Mental Disorders, at 566, *et. seq*, (Fourth Edition) (discussing paraphilias). "Social and sexual relationships may suffer if others find the unusual sexual behavior shameful or repugnant." *Id.* Mr. Handley seems to exhibit the diagnostic criteria for pedophilia, namely recurring sexual arousal or fantasies involving sexual

activity with children, the sexual fantasies have caused interpersonal difficulties, and he is at least 16 and more than 5 years older than the children about whom he fantasizes. *Id.* at 572.

Mr. Handley seems a strong candidate to recidivate as far as child obscenity or even child pornography offenses are concerned, unless and until he addresses his mental health issues. The sentence imposed should include the maximum possible terms of supervision because the defendant will need assistance to address these issues, but there is no guarantee as to if or when he will do so.

Mr. Handley, undoubtedly, has deep-seated aberrant sexual disorders, which are not, based on the current state of affairs, likely to disappear within a few years of release from prison, without considerable effort on his part, after evaluation and treatment by mental health professionals.

**H. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.** It appears that other defendants who have been charged with violating § 1466A have also been convicted of producing, distributing, receiving, or possessing child pornography, and have been sentenced under those statutes. There are no published decisions to provide guidance on the standard sentencing range for a person primarily facing sentencing for receiving and possessing visual depictions on the sexual exploitation of children.

As noted earlier, however, § 1466A addresses a form of obscenity. And there are published decisions to facilitate the informed decision-making in this case. For example, in *United States v. Ragsdale*, 426 F.3d 765 (5th Cir. 2005), a couple who sold videos that depicted adults being subjected to the same types of sexual assaults as those depicted in many of the drawings in this case were sentenced to 30 and 36 months imprisonment, respectively.

The case law, statute, and guidelines establish that a sentence involving some term of imprisonment is appropriate.

**V. Conclusion.**

The government's sentencing recommendation is based, in part, on the assumption that the Defendant will, before sentencing is pronounced, agree to a joint sentencing recommendation, and clearly accept responsibility for his conduct.

Should that occur, based on all of the factors in 18 U.S.C. § 3553(a), but specifically the seriousness and nature of the offense, which is based on the defendant's obsessive sexual attraction to drawn images of small children being sexually abused by other children, adults, and animals; the characteristics of the defendant, "whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison," H.R. Rep. No. 108-66, at 49 - 50 (2003), 2003 USCCAN 683, 684; the need to provide deterrence to this defendant and others; and the need to provide needed medical care and correctional treatment, the government argues for 6 months' imprisonment on count two, violating 18 U.S.C. § 1466A(b), a class C felony, followed by 3 years of supervised release; and 5 years of probation on count five, violating 18 U.S.C. § 1461, a class D felony, to begin at the same time as, and run partially concurrent with, the 3-year supervised release term, as provided in 18 U.S.C. § 3564(b).

The United States reserves the right to change its recommendation in the event the Defendant either does not execute the joint recommendation, or engages in any conduct inconsistent with acceptance of responsibility or that obstructs the presentence investigation.

Respectfully submitted,

Nicholas A. Klinefeldt
United States Attorney

By: /s/ *Craig Peyton Gaumer*

Craig Peyton Gaumer
Assistant United States Attorney
U.S. Courthouse Annex, Suite 286
110 E. Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record.

UNITED STATES ATTORNEY

By: /s/ *J. Beane*